UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA and NEW YORK STATE, *ex rels*. JESENIA POLANCO, FRANCES ALDANA, JULIETA CUSSINO, and DEENA LETTAS,<br><br>                              Plaintiffs/Relator,<br><br>  -against-<br><br>NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY,<br><br><br><br>                              Defendants. | Case No: 23-cv-8078 (LDH)(PK)<br><br><br><br>**SECOND AMENDED COMPLAINT** |

Plaintiffs, the United States of America and New York State (together, "Plaintiffs") *ex rels*. Jesenia Polanco, Frances Aldana, Julieta Cussino, and Deena Lettas by and through their attorneys Cohen & Cohen Law, allege upon actual knowledge and/or upon information and belief as follows:

## NATURE OF CLAIM

1.      Relators, Jesenia Polanco (herein, "Polanco"), Frances Aldana (herein, "Aldana"), Julieta Cussino (herein, "Cussino"), and Deena Lettas (herein, "Lettas") (together, "Relators") bring this complaint: (1) on behalf of themselves and on behalf of the United States of America against Defendant New York City School Construction Authority (herein, "SCA") under the False Claims Act, 31 U.S.C. § 3729 *et seq*. (herein, "Federal False Claims Act"), to recover damages sustained by, and penalties owed to the United States of America as Defendant SCA presented or caused to be presented false or fraudulent claims and/or conspired to present false or fraudulent claims; and (2) on behalf of themselves and on behalf of New York State against Defendant SCA under the New York State Finance Law § 187 *et seq*. (herein, "NYS False Claims Act"), to recover

damages sustained by, and penalties owed to New York State as Defendant SCA presented or caused to be presented false or fraudulent claims.

2.     Additionally, this is a civil action for damages and equitable relief based upon violations that Defendant SCA committed of Relators' rights guaranteed to them by the Federal False Claims Act, NYS False Claims Act, and NYC False Claims Act's anti-retaliation provisions and any other claims that may be inferred from the facts set forth herein.

3.     As described below, Relators discovered and investigated fraudulent acts that Defendant SCA committed which involved the misuse of federal and state funds, subsequently complained about the misuse to supervisors, and Defendant SCA retaliated against Relators, in violation of the aforementioned anti-retaliation provisions, by creating a hostile work environment and/or terminating Relator's employment.

## **JURISDICTION AND VENUE**

4.     This Court has jurisdiction over Plaintiffs/Relators' claims pursuant to 31 U.S.C. §§ 3732(a) and 3732(b) and 28 U.S.C. §§ 1331, 1345, and 1367.

5.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c), because at least one defendant is located in this district and the underlying acts complained of herein took place in this district.

## **PARTIES**

6.     At all relevant times herein, Relator Aldana is a former employee of Defendant SCA and was entitled to protection as provided by 31 U.S.C. § 3730(h).

7.     At all relevant times herein, Relator Cussino is a current employee of Defendant SCA and is entitled to protection as provided by 31 U.S.C. § 3730(h).

Our File No.: 132265

8. At all relevant times herein, Relator Polanco is a former employee of Defendant SCA and was entitled to protection as provided by 31 U.S.C. § 3730(h).

9. At all relevant times herein, Relator Lettas is a former employee of Defendant SCA and was entitled to protection as provided by 31 U.S.C. § 3730(h).

10. At all relevant times herein, Defendant SCA was and is a municipal public-benefit corporation created and established by the New York State legislature in 1988 to manage the design, construction, and renovations of New York City public school buildings.

## **BACKGROUND FACTS**

A. Funding

11. From 2015 through 2019, New York State directly funded about Sixteen Percent (16%) or approximately Two Billion Five Hundred Million Dollars ($2,500,000,000.00) of Defendant SCA's capital costs.

12. From 2020 through 2024, New York State directly funded about Eight Percent (8%) or approximately One Billion Five Hundred Million Dollars ($1,500,000,000.00) of Defendant SCA's capital costs.

13. Additionally, New York State, through the New York City Transitional Finance Authority, reimburses the City of New York approximately forty-seven percent (47%) of Defendant SCA's capital costs.

14. From 2018 through 2022, the Federal Emergency Management Agency (herein, "FEMA") reimbursed Defendant SCA Five Hundred Million Dollars ($500,000,000.00) in restoration costs associated with schools damaged during Superstorm Sandy.

Our File No.: 132265

B. Tracking Systems

15. Defendant SCA has historically stored all of its records and data in its Online Capital Plan Development System (herein, "OCPDS").

16. OCPDS was designed to manage the full lifecycle of capital projects and ensure that all project data is accurately recorded and tracked.

17. OCPDS allows its users to search, view, revise, close out projects, and manage project schedules, costs, and attributes. Additionally, OCPDS allows its users to filter, export, and create detail reports.

18. Ultimately, OCPDS provides a comprehensive database of all buildings and/or assets to link projects to each building and/or asset for planning, budgeting, and tracking purposes.

19. As recently as June 2025, Defendant SCA stopped using OCPDS and began using the Capital Planning System (herein, "CPS").

20. Defendant SCA used OCPDS to track and manage school facility improvements and construction projects such as: (1) Capacity Projects; (2) Healthy School Projects; (3) Capital Improvement Projects; (4) Mandated Projects; (5) and Citywide Projects.

21. Capacity Projects refer to the creation of new schools, including but not limited to procurement of land, design, and construction.

22. Healthy School Projects aim to: (1) improve physical education facilities, (2) create an atmosphere with children's mental well-being in mind; (3) provide healthier meals; and (4) reduce each school's carbon footprint.

23. Capital Improvement Projects update each school's facilities and equipment that are in need of renovations and remediation.

4

Our File No.: 132265

24.     Mandated Projects are designed to remediate schools and ensure building code compliance.

25.     Citywide Category projects address needs across all schools and are not exclusive to one project category.

26.     OCPDS generates and stores important project details such as the DSF [Division of School Facilities] number and the Financial Management System (herein, "FMS") number.

27.     The DSF and FMS numbers are unique identifiers that are generated by OCPDS and used to coordinate projects across Defendant SCA's various systems.

28.     DSF and FMS numbers are transferred to the Project Tracking System (herein, "PTS") to maintain consistency in project identification.

29.     The FMS number is also used in the Oracle system (herein, "Oracle"), which is another system designed to track financial data.

30.     PTS is used to manage and monitor project progress from inception to completion.

31.     More specifically, PTS tracks: (1) project identifiers such as Lower Level of Work (herein, "LLW") numbers, design numbers, package numbers, and work descriptions, (2) scope and location of projects by building identification numbers, school names, boroughs, and project descriptions; and (3) funding and authorization by Department of Education (herein, "DOE") construction amount, DOE total authorized amount, and other funding categories.

32.     PTS creates an LLW number for each project.

33.     The LLW number is required to create contracts and invoices.

34.     PTS receives DSF and FMS numbers from OCPDS and aligns each project estimate in OCPDS with the actual cost of each project.

Our File No.: 132265

35. Oracle is Defendant SCA's financial management system for contracts, purchase orders, invoices, and payments related to all projects.

36. Oracle reconciles expenditures with project identifiers generated by CPS and PTS, i.e., DSF, FMS, and LLW numbers, which allows Oracle to link financial transactions to specific project identifiers, i.e., DSF, FMS, and LLW numbers.

C. Spending

37. From 2017 through the present, Defendant SCA's budget, excluding payroll, has been Thirty-Four Billion Nine Hundred Fifty-Six Million Dollars ($34,956,000,000.00).

38. From 2017 through the present, Defendant SCA's total estimate of all its projects was Eight Billion Nine Hundred Sixty Million Dollars ($8,960,000,000.00).

39. However, from 2017 through the present, Defendant SCA spent a total of Twenty-Seven Billion Four Hundred Ninety Million Dollars ($27,490,000,000.00) on all its projects.

40. Therefore, from 2017 through the present, Defendant SCA exceeded its estimates by Eighteen Billion Five Hundred Thirty Million Dollars ($18,530,000,000.00).

41. In other words, from 2017 through the present, Defendant SCA spent three dollars for every one dollar that it should have spent.

42. Defendant SCA projected that it would assign Bravo VBC Group, LLC Three Billion Eight Hundred Ten Million Dollars ($3,810,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Bravo VBC Group, LLC a total of One Hundred Sixty-Six Million Two Hundred Thousand Dollars ($166,200,000.00).

43. Either Defendant SCA misrepresented and/or grossly overestimated the amount of work that it expected to assign to Bravo VBC Group, LLC or Defendant SCA failed to properly record payments that it made to Bravo VBC Group, LLC.

6

Our File No.: 132265

44.    Defendant SCA projected that it would assign STV Incorporated Seven Hundred Million Dollars ($700,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid STV Incorporated a total of One Hundred Thirty-Two Million Dollars ($132,000,000.00).

45.    Either Defendant SCA misrepresented and/or grossly overestimated the amount of work that it expected to assign to STV Incorporated or Defendant SCA failed to properly record payments that it made to STV Incorporated.

46.    Defendant SCA projected that it would assign Citnalta Construction Corp. Forty-Four Million Seven Hundred Thousand Dollars ($44,700,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Citnalta Construction Corp. a total of Four Hundred Forty-Nine Million Dollars ($449,000,000.00).

47.    Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Citnalta Construction Corp. or Defendant SCA failed to properly record payments that it made to Citnalta Construction Corp..

48.    Defendant SCA projected that it would assign TDX Construction Corp. Two Billion Four Hundred Million Dollars ($2,400,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid TDX Construction Corp. a total of Two Hundred Fourteen Million Dollars ($214,000,000.00).

49.    Either Defendant SCA misrepresented and/or grossly overestimated the amount of work that it expected to assign to TDX Construction Corp. or Defendant SCA failed to properly record payments that it made to TDX Construction Corp.

50.    Defendant SCA had excluded Leon D. Dematteis Construction Corporation in its budget for the period of 2017 through the present, yet Defendant SCA paid Leon D. Dematteis

Our File No.: 132265

Construction Corporation Fifty-Six Million Eight Hundred Eighty-Five Thousand Dollars ($56,885,000.00).

51.    Defendant SCA projected that it would assign Navillus Tile, Inc. Twenty-Five Million Dollars ($25,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Navillus Tile, Inc. a total of Three Hundred Nine Million Dollars ($309,000,000.00).

52.    Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Navillus Tile, Inc. or Defendant SCA failed to properly record payments that it made to Navillus Tile, Inc..

53.    In 2021, "a jury returned guilty verdicts against Donal O'Sullivan, the founder, owner and President of Navillus . . . on all 11 counts of charging wire fraud, mail fraud, embezzlement from employee benefits funds, submission of false remittance reports to union benefits funds, and conspiracy to commit those crimes."[1]

54.    Nonetheless, Defendant SCA continues to do business with Navillus Tile, Inc.

55.    Defendant SCA projected that it would assign Adam's European Contracting Inc. Eight Hundred Fifty-One Million Two Hundred Thousand Dollars ($851,200,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Adam's European Contracting Inc. a total of Ninety-Six Million One Hundred Thousand Dollars ($96,100,000.00).

---

[1] https://www.justice.gov/usao-edny/pr/navillus-construction-executives-convicted-embezzling-union-benefits-funds

Our File No.: 132265

56.     Either Defendant SCA misrepresented and/or grossly overestimated the amount of work that it expected to assign to Adam's European Contracting Inc. or Defendant SCA failed to properly record payments that it made to Adam's European Contracting Inc.

57.     Defendant SCA projected that it would assign Technico Construction Services Inc. Twenty-Eight Million Dollars ($28,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Technico Construction Services Inc. a total of Five Hundred Twenty-Two Million Dollars ($522,000,000.00).

58.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Technico Construction Services Inc. or Defendant SCA failed to properly record payments that it made to Technico Construction Services Inc.

59.     Defendant SCA projected that it would assign Kel-Tech Construction Inc. Seven Hundred Forty-One Million Dollars ($741,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Kel-Tech Construction Inc. a total of Four Hundred Forty-Nine Million Dollars ($449,000,000.00).

60.     Either Defendant SCA misrepresented and/or grossly overestimated the amount of work that it expected to assign to Kel-Tech Construction Inc. or Defendant SCA failed to properly record payments that it made to Kel-Tech Construction Inc.

61.     Defendant SCA projected that it would assign Army Construction, LLC Twelve Million Dollars ($12,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Army Construction, LLC a total of Ninety-Four Million Dollars ($94,000,000.00).

9

Our File No.: 132265

62.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Army Construction, LLC or Defendant SCA failed to properly record payments that it made to Army Construction, LLC.

63.     Defendant SCA projected that it would assign Forte Construction Corp. Sixty-Nine Million Dollars ($69,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Forte Construction Corp. a total of Two Hundred Seventy-Seven Million Dollars ($277,000,000.00).

64.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Forte Construction Corp. or Defendant SCA failed to properly record payments that it made to Forte Construction Corp.

65.     Defendant SCA projected that it would assign Venus Group, Inc. Five Million Dollars ($5,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Venus Group, Inc. a total of Fifty-Three Million Dollars ($53,000,000.00).

66.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Venus Group, Inc. or Defendant SCA failed to properly record payments that it made to Venus Group, Inc.

67.     Defendant SCA projected that it would assign Northeast Restoration Corp. Four Million Dollars ($4,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Northeast Restoration Corp. a total of Thirty Million Dollars ($30,000,000.00).

Our File No.: 132265

68.    Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Northeast Restoration Corp. or Defendant SCA failed to properly record payments that it made to Northeast Restoration Corp..

69.    Defendant SCA projected that it would assign Litehouse Builders, Inc. Three Million Dollars ($3,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Litehouse Builders, Inc. a total of Twenty Million Dollars ($20,000,000.00).

70.    Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Litehouse Builders, Inc. or Defendant SCA failed to properly record payments that it made to Litehouse Builders, Inc.

71.    Defendant SCA projected that it would assign LiRo Program and Construction LLC One Billion Dollars ($1,000,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid LiRo Program and Construction LLC a total of Fifty-Four Million Dollars ($54,000,000.00).

72.    Either Defendant SCA misrepresented and/or grossly overestimated the amount of work that it expected to assign to LiRo Program and Construction LLC or Defendant SCA failed to properly record payments that it made to LiRo Program and Construction LLC.

73.    Defendant SCA projected that it would assign J & N Construction Group Corp. Two Million Dollars ($2,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid J & N Construction Group Corp. a total of Fifteen Million Dollars ($15,000,000.00).

11

Our File No.: 132265

74.    Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to J & N Construction Group Corp. or Defendant SCA failed to properly record payments that it made to J & N Construction Group Corp.

75.    Defendant SCA projected that it would assign AMCON Contracting Corp. One Million Dollars ($1,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid AMCON Contracting Corp. a total of Ten Million Dollars ($10,000,000.00).

76.    Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to AMCON Contracting Corp. or Defendant SCA failed to properly record payments that it made to AMCON Contracting Corp.

77.    Defendant SCA projected that it would assign Whitestone Construction Corp. Four Hundred Twelve Million Dollars ($412,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Whitestone Construction Corp. a total of Two Hundred Fourteen Million Dollars ($214,000,000.00).

78.    Either Defendant SCA misrepresented and/or grossly overestimated the amount of work that it expected to assign to Whitestone Construction Corp. or Defendant SCA failed to properly record payments that it made to Whitestone Construction Corp.

79.    Defendant SCA projected that it would assign ABC Construction Contracting Inc. Twenty-Five Million Dollars ($25,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid ABC Construction Contracting Inc. a total of Eighty-Eight Million Dollars ($88,000,000.00).

Our File No.: 132265

80.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to ABC Construction Contracting Inc. or Defendant SCA failed to properly record payments that it made to ABC Construction Contracting Inc.

81.     Defendant SCA projected that it would assign Ansu Construction, Inc. Three Million Dollars ($3,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Ansu Construction, Inc. a total of Fifteen Million Dollars ($15,000,000.00).

82.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Ansu Construction, Inc. or Defendant SCA failed to properly record payments that it made to Ansu Construction, Inc.

83.     Defendant SCA projected that it would assign Ashnu International Inc. Ten Million Dollars ($10,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Ashnu International Inc. a total of Sixty-Four Million Dollars ($64,000,000.00).

84.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Ashnu International Inc. or Defendant SCA failed to properly record payments that it made to Ashnu International Inc.

85.     Defendant SCA projected that it would assign Padilla Construction Services, Inc. Ten Million Dollars ($10,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid Padilla Construction Services, Inc. a total of Ninety-Three Million Dollars ($93,000,000.00).

Our File No.: 132265

86.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to Padilla Construction Services, Inc. or Defendant SCA failed to properly record payments that it made to Padilla Construction Services, Inc.

87.     Defendant SCA projected that it would assign The McCloud Group, L.L.C. Five Hundred Million Dollars ($500,000,000.00) in projects, between 2017 through the present, however Oracle recorded that Defendant SCA paid The McCloud Group, L.L.C. a total of Sixty Million Dollars ($60,000,000.00).

88.     Either Defendant SCA misrepresented and/or grossly underestimated the amount of work that it expected to assign to The McCloud Group, L.L.C. or Defendant SCA failed to properly record payments that it made to The McCloud Group, L.L.C.

89.     Defendant SCA paid ABC Construction Contracting Inc., Adam's European Contracting Inc., Bradford Construction Corp. of New York, LiRo Program and Construction LLC, Padilla Construction Services, Inc., and TDX Construction Corp., Technico Construction Service Inc., The McCloud Group, L.L.C. nearly Twelve Million Dollars ($12,000,000.00) in federal funds.

D.  Relator Polanco

90.     In January 1997, the New York City Department of Education (herein, "NYCDOE") hired Relator Polanco as a temporary secretary in the Capital Plan Unit (herein, "CPU").

91.     In May 2001, the NYCDOE changed Relator Polanco's employment status from temporary to permanent.

92.     In August 2010, Relator Polanco transitioned from a NYCDOE employee to a Defendant SCA employee as an Administrative Assistant.

14

Our File No.: 132265

93. During Relator Polanco's tenure, in the CPU, she managed the following three funding and/or project programs: (1) Citywide Categories - - projects that address needs across all schools and not exclusive to one project category; (2) Commitment Plan - - committed funds for all school scope, design, and construction projects; (3) Resolution A Program - - capital funding allocated by New York City council members and Borough Presidents for school projects.

94. Additionally, Relator Polanco worked on the development of OCPDS and Oracle Intake System, which is the predecessor of the Project Tracking System.

95. In 2003, the CPU moved from NYCDOE's office at 28-11 Vernon Boulevard, Long Island City, NY 11101 to Defendant SCA's then headquarters at 30-30 Thomson Avenue, Long Island City, NY 11101.

96. In 2004, the CPU was officially transferred from NYCDOE to Defendant SCA.

97. Although the CPU was transferred from NYCDOE to Defendant SCA, Relator Polanco remained an employee of NYCDOE until her transfer in August 2010.

98. Upon the CPU's transfer to Defendant SCA, Relator Polanco trained the then Director, Elizabeth Bergin, and then Manager of Operations Asuka Nina Kubota, in the following: (1) the Five-Year Capital Plan process; (2) OCPDS; and (3) CPU's operation and functions.

99. During Relator Polanco's tenure she managed projects - - i.e., Capacity Projects, Capital Improvement Projects, Citywide Projects, Reso A Projects - - in Manhattan and Staten Island which later expanded to all projects in New York City.

100. In 2015, the CPU grew into the Capital Plan Management Department (herein, "CPMD") and Defendant SCA promoted Relator Polanco to Senior Program Manager.

101. Relator Polanco was assigned to a subdivision of the CPMD called the Special Projects Unit (herein, "SPU").

Our File No.: 132265

102. While employed in the SPU, Relator Polanco: (1) coordinated various city-wide programs; (2) ensured projects were appropriately funded and scheduled; and (3) served as a liaison between the CPMD, Operations, and other New York City agencies and/or departments.

103. Relator Polanco tracked the budgets of the NYCDOE and Defendant SCA for nearly three decades.

104. Relator Polanco would often advise her supervisors that the amounts spent on projects were significantly greater than the proposed budget.

105. However, Relator Polanco's supervisors ignored her concerns.

106. Relator Polanco expressed her concerns to her supervisors when they told her to create fake Building Identification Numbers and to put expenditures under that category.

107. In 2023, Diana Mendez, Director of Operations became Relator Polanco's supervisor.

108. Diana Mendez discriminated against Relator Polanco because of her national origin and accent.

109. Among other things, Diana Mendez publicly mocked Relator Polanco's accent.

110. In 2023, Relator Polanco was hospitalized and diagnosed with Functional Neurological Disorder, which impairs Relator Polanco's ability to walk and speak.

111. Relator Polanco's neurologist opined that Relator Polanco's Functional Neurological Disorder was primarily triggered by work related stressors, i.e., the hostile work environment created by Diana Mendez.

112. In July 2024, Relator Polanco filed a complaint with Defendant SCA's Equal Employment Opportunity (herein, "EEO") office regarding Diana Mendez's hostile conduct.

16

Our File No.: 132265

113. Immediately thereafter, Diana Mendez, and the Vice President of CPMD, Cora Liu, met with Relator Polanco and gave her a negative performance evaluation and placed her on a performance improvement plan.

114. In May 2025, Relator Polanco downloaded various tracking systems to further investigate Defendant SCA's fraudulent conduct.

115. Additionally, Relator Polanco contacted CPMD's Program Coordinator to gain access to a recently updated version of Oracle.

116. Subsequently, on or about June 4, 2025, Relator Polanco's Microsoft account stopped working.

117. Two days later, the Director of Operations of the Information Technology Department, Sean Connolly, directed Relator Polanco to return her computer to Defendant SCA.

118. Relator Polanco returned her computer and Defendant SCA provided her a new computer.

119. This was prompted by Relator Polanco's request to gain access to the updated Oracle system as the Office of the Inspector General (herein, "OIG"), a subagency of Defendant SCA, had been monitoring Relator Polanco's emails.

120. Around that time, Diana Mendez told an employee that Relator Polanco's emails were being monitored by the OIG and that Relator Polanco was going to be terminated.

121. Two months later, Relator Polanco was terminated.

122. Defendant SCA claimed that it terminated Relator Polanco because of her poor performance, yet Relator Polanco had previously received positive performance evaluations for nearly two decades.

Our File No.: 132265

123. Since Relator Polanco's termination, Nick Scicutella of the OIG has been contacting Relator Polanco to return her work computer.

124. Nick Scicutella of the OIG is handling a simple human resource task, because Defendant SCA and the OIG have been seeking to cover up its fraudulent conduct and undo Relator Polanco's investigation.

E. Relator Aldana

125. From April 2013 until her termination in July 2023, Relator worked under the management of Defendant SCA as a Management Specialist.

126. As a Management Specialist Relator Aldana was responsible for reviewing Proposal Authorization Requests (herein, "PARs").

127. PARs are descriptions of the services provided by architectural and/or engineering firms and the cost of those services.

128. During Relator Aldana's employment with Defendant SCA, Defendant SCA engaged in unscrupulous acts, including but not limited to contemporaneously employing officers of contractors.

129. For example, Armando Salazar, was and is the Vice President of Bravo VBC Group, LLC and is also a mechanical engineer of Defendant SCA.

130. Additionally, Defendant SCA officers and employees used their positions to enable contractors' fraud in exchange for employment and other benefits.

131. For example, the current President of Bradford Construction Corp. of New York, Lorraine Grillo, was the former President of Defendant SCA and a former trustee of Defendant SCA.

Our File No.: 132265

132. During Lorraine Grillo's tenure Bradford Construction Corp. of New York and Bravo VBC Group, LLC were notorious for overcharging and repeatedly billing Defendant SCA for services that were already paid and/or for services that were never performed.

133. Lorraine Grillo has pressured and continues to pressure current leadership of Defendant SCA and employees of Defendant SCA to speed up payments to Bravo VBC Group, LLC and other contractors, which further exacerbates Defendant SCA's practice of paying invoices without adequate review.

134. In January 2023, Defendant SCA's Director of Operations, Stacey Spann-Thom, advised Operations Managers to generate and remit payments to architectural firms for "fast tracked projects" or "older projects" without the review of Management Specialists.

135. In other words, Defendant SCA instructed Operations Managers to approve and/or remit payments to contractors without quality control.

136. In April of 2023, Relator Aldana was assigned to work on Velocity Architecture & Engineering Group, D.P.C.'s accounts.

137. On or about July 1, 2023, Relator Aldana had begun to recognize PARs that had already been approved for payment or that had been previously rejected.

138. Subsequently, Relator Aldana reviewed previously approved PARs and/or rejected PARs and discovered that Velocity Architecture & Engineering Group, D.P.C. had been resubmitting PARs to Defendant SCA that Defendant SCA had previously paid or rejected.

139. On July 6, 2023, Relator Aldana emailed Stacey Spann-Thom regarding her findings that Velocity Architecture & Engineering Group, D.P.C. had been paid twice for the same project and services.

Our File No.: 132265

140.    On July 14, 2023, at 11:00 A.M., Relator Aldana was called into a meeting by Stacey Spann-Thom and the Chief Contracting Officer, Stacey Tyson.

141.    At the meeting Stacey Spann-Thom and Stacey Tyson ignored Relator Aldana's double-billing concerns.

142.    Instead, Stacey Spann-Thom advised Relator Aldana that Defendant SCA appreciated her years of service, but that her employment had been terminated.

143.    Immediately thereafter, she was escorted off Defendant SCA's premises by security.

144.    On July 20, 2023, Relator Aldana contacted the New York City Department of Investigations which then referred her to Nick Scicutella from the OIG - - the same Nick Scicutella who has been involved in tracking Relator Polanco's computer.

145.    The OIG's investigation included a review of documentary evidence and interviews with Defendant SCA's employees.

146.    Concurrent with the OIG's investigation, Relator Aldana spoke with Defendant SCA employees who were interviewed by the OIG and those employees said that they told the OIG that: (1) fraud was being committed by contractors and provided examples of fraud; and (2) Defendant SCA's Information Technology Department has deleted company emails at the direction of management.

147.    Nonetheless, the OIG, a subdepartment of Defendant SCA, determined that Defendant SCA and contractors did not commit fraud.

148.    The OIG, as a subdepartment of Defendant SCA, cannot make impartial determinations as to Defendant SCA.

20

Our File No.: 132265

F.   Relator Cussino

149.   In 2021, Relator Cussino was hired as an Operations Manager by Defendant SCA.

150.   As an Operations Manager, Relator Cussino worked in the Real Estate Division, where she: (1) supported the Senior Director of Real Estate with all departmental functions; (2) prepared monthly executive reports for senior management; (3) delegated assignments, edited departmental documents, and tracked budget items; (4) provided general managerial and operations support; (5) updated policies and procedures and assisted with training implementation; (6) conducted site visits across all five boroughs to evaluate DOE-occupied leased facilities to prepare reports for senior management.

151.   In May 2022, Relator Cussino began identifying safety, compliance, and operational deficiencies during site visits at DOE-occupied leased facilities.

152.   Additionally, Project Officers advised Relator Cussino that contractors would fail to complete projects and leave schools in dangerous conditions but still seek payment from Defendant SCA for incomplete work and substandard work.

153.   For example, Relator Cussino and Project Officers: (1) found students - - including students with developmental disabilities - - crammed into small shed-like spaces without air conditioning, ventilation, and windows; (2) playgrounds with dangerous surfaces; (3) asbestos contamination; and (4) sanitation deficiencies - - i.e., unsanitary bathrooms and kitchens, leaks and standing water, unremoved garbage and pest infestation, etc.

154.   Relator Cussino prepared detailed reports on Environmental Hazards at each school and submitted it to Michael Cona, who was a Senior Project Manager at the time, and to other leadership in the Real Estate Division.

21

Our File No.: 132265

155.    Michael Cona and other leadership in the Real Estate Division acknowledged receipt of Relator Cussino's reports.

156.    Nonetheless, Defendant SCA failed to remediate Environmental Hazards.

157.    Therefore, Relator Cussino escalated reports on Environmental Hazards to: (1) General Counsel, Nadine Rivellese; (2) Deputy General Counsel and Counsel for the Real Estate Division, Tina Isselbacher; and (3) Vice President of Capital Planning, Cora Liu.

158.    Subsequently, Relator Cussino's supervisor, Gayle Mandaro, then Senior Director of Real Estate, and Michael Cona, advised Relator Cussino that Environmental Hazards were not SCA's responsibility.

159.    Shortly thereafter, Defendant SCA removed Relator Cussino's job responsibilities that required her to perform site visits and removed her credentials to access the Digital Lease Management System, which tracks leases, property violations, and facts sheets.

160.    Meanwhile, Defendant SCA continued to blindly approve payments to contractors from funds dedicated to complying with the Individuals with Disabilities Education Act and Title I of Every Student Succeeds Act, formerly known as Elementary and Secondary Education Act.

161.    A few months later, Defendant SCA moved Relator Cussino to the Office of General Counsel.

162.    After Relator Cussino's transfer, Project Officers continued to report to Relator Cussino about the Environmental Hazards at schools.

163.    Relator Cussino, as an Operations Manager in the Office of General Counsel: (1) played a lead role in facilitating the operations of the Legal Department; (2) coordinated departmental and agency-wide projects, including but not limited to the legal intake process, (3) review invoices from law firms for accuracy and sent them out for approval; (4) provided ongoing

Our File No.: 132265

support to the Real Estate Division and Labor Department with work that involves the Office of General Counsel; (5) developed and prepared formal reports for senior management, including but not limited to quarterly reports, budget reports, and the Case Analysis Tracking System report; (6) managed the Office of General Counsel and Labor Departments' budget; (7) developed guidelines and policies to promote consistency of operations, efficiency, knowledge transfer; and (8) volunteered in the Equal Employment Opportunity Office to assist with files and ensuring compliance.

164.    Relator Cussino assisted Relator Polanco with the filing of her complaint with the EEO office in June 2024.

165.    During this time Relator Cussino and Relator Polanco worked together to uncover Defendant SCA's fraud, waste, and abuse.

166.    Instead of addressing Environmental Hazards in schools, Defendant SCA retaliated against Relator Cussino by: (1) removing job responsibilities; (2) transferring her to different departments; (3) publicly mocking her accent; and (4) threatening her based on her immigration status.

G.  <u>Relator Lettas</u>

167.    From July 2022 through March 2025, Relator Lettas worked as Senior Management Specialist in the Business Process & Policy Unit of Defendant SCA.

168.    In April 2024, Relator Lettas' supervisor, Shannon Fales, requested that she draft a procurement manual to be a comprehensive reference guide and standard operating manual that details Defendant SCA's policies, procedures, and responsibilities for planning, soliciting, evaluations, awarding, and administering contracts (herein, "Procurement Manual").

Our File No.: 132265

169.    Relator Lettas sought to: (1) conduct contract enforcement analysis; (2) conduct contract award analysis, and (3) document systemic deficiencies in bids for projects and payments.

170.    Relator Lettas noticed that Defendant SCA's contract award and contract enforcement practices failed to comply with New York Public Authority Law § 2879 and New York State Finance Law § 163.

171.    For example, Relator Lettas observed Defendant SCA awarding Mini Request for Proposals without any written award justifications and without meaningful competition from eligible contract holders.

172.    A Mini Request for Proposal is a simplified bidding process used to assign new projects to contractors that have contracts with Defendant SCA.

173.    Relator Lettas also observed Defendant SCA repeatedly fail to enforce contract terms, including but not limited to missed Minority & Women Owned Business commitments, billing for unapproved services, incomplete documentation, and missed deadlines without applying enforcement remedies - - i.e., withholding or denying payment, required remediation, or termination.

174.    Relator Lettas advised her supervisor that Defendant SCA's contract award and contract enforcement practices failed to comply with the Public Authorities Law.

175.    Relator Lettas advised her supervisor, Shannon Fales, regarding the lack of project oversight and quality control but Shannon Fales ignored Relator Lettas' concerns.

176.    Shannon Fales advised Relator Lettas that she would report Relator Lettas' concerns to Brian Fleischer, Director of Enterprise Risk, and Rob Sanft, Shannon Fales' supervisor, but she did not.

Our File No.: 132265

177. When Relator Lettas followed up with Shannon Fales about reporting the concerns to leadership, Shannon Fales accused Relator Lettas of being hostile.

178. Subsequently, Shannon Fales and other members of leadership refused to work with Relator Lettas.

179. For example, Keishanna Dennis, the employee responsible for the Procurement Manual refused to respond to Relator Lettas' question regarding the Procurement Manual.

180. Therefore, Relator Lettas' supervisors would state that her work was incomplete, but that was due to leadership's refusal to communicate with her.

181. Subsequently, Relator Lettas complained to Defendant SCA that she was being retaliated against by her supervisors and leadership, but Defendant SCA refused to conduct and/or conclude its investigation.

182. As a result of Defendant SCA's retaliatory conduct, Relator Lettas resigned from Defendant SCA.

H. The OIG Refusal to Investigate its Employer Defendant SCA

183. According to Defendant SCA's website: "The Office of the Inspector General's [(herein, "OIG")] mission is to protect the SCA from fraud, waste, and abuse and to ensure its employees and contractors are complying with all federal, state, and local laws as well as all SCA policies and protocols."

184. Defendant SCA further claims that the OIG "seeks to prevent the SCA from victimization from fraudulent schemes, racketeering, wasteful practices, and all manner of crimes and misconduct perpetuated by those doing business with, as well as those employed by the SCA."

185. Defendant SCA claims that the OIG prevents fraud by scrutinizing "billing for services or supplies not delivered; failure to pay prevailing wage; bribery and extortion in the

Our File No.: 132265

inspectional services; bid rigging, price fixing; labor racketeering by union officials and corporate officers; no show employee payrolls; and misuse of SCA resources."

186.    However, the OIG has not only failed to identify and prevent fraud, waste, and abuse, the OIG has actively protected Defendant SCA in its deliberate practice of fraud, waste, and abuse.

187.    For example, one former employee of the OIG, Seth Alter, was terminated by Defendant SCA in 2022 for investigating:

188.    Improper commingling of funds for projects that were required to be funded from a specific source of funds for other types of projects as well as use of restricted funds for projects outside the scope of the restriction.  This included use of "Hurricane Sandy" funds for non-Hurricane Sandy projects and use of School Construction Authority Funds for non-school related projects, such as COVID testing centers at Kennedy and LaGuardia airports, as well as for the cleaning of Rikers Island jails.

189.    Improper non-emergency use of contractors who were only eligible to be hired outside of the normal bidding process for emergency situations.

190.    Potential violations of procurement processes, including not obtaining the minimum required number of bidders for projects and discrimination against certain bidders.

191.    Based on Seth Alter's review of publicly available financial statements of the School Construction Authority and the New York City Department of Education, potentially improper transactions between the two entities totaling in hundreds of millions of dollars.  Seth Alter also noted that the Department of Education's financial statements indicated questionable revenue from the School Construction Authority.

Our File No.: 132265

192.    Annexed hereto as Exhibit A is a copy of Seth Alter's Complaint in the action titled *Seth Alter v. New York City School Construction Authority and Felice Sontupe*; Case No.: 23-cv-02305 (ALC)(HJR); pending in the United States District Court for the Southern District of New York (herein, "Exhibit A").

193.    Seth Alter was employed as an Investigative Accountant by Defendant SCA from 2014 through 2022. Id. at ¶¶ 14-15.

194.    Seth Alter is a certified public accountant and a certified fraud examiner, and he is also certified in financial forensics. Id. at ¶ 13.

195.    Seth Alter's job responsibilities included "conduct[ing] audits of corporate records, contracts, and submissions … manag[ing] the evidentiary chain and inventory for all books, records, and other documents obtained in the course of investigation [and] assisting legal staff." Id. at ¶ 16.

196.    When Seth Alter suggested that the OIG should investigate fraud, waste, and abuse of funds to the then acting Inspector General of Defendant SCA, Felice Sontupe, Seth Alter was retaliated against. Id. at ¶ 24.

197.    Defendant SCA, Felice Sontupe, and the OIG had retaliated against Seth Alter by: (1) withdrawing "prior recommendations to promote" him; (2) ignoring his observations; (3) limiting his access to view confidential files, (4) telling him to stop investigating "various areas of potential School Construction Authority wrongdoing; and (5) describing him as an "antagonistic," "disruptive," "unprofessional," and "hostile to [his] superiors." Id. at ¶¶ 24-26.

198.    In December 2021, Seth Alter had submitted a written complaint about the retaliation to the New York City Department of Investigations. Id. at ¶ 31.

27

Our File No.: 132265

199.    In September 2022, the New York City Department of Investigations decided that Defendant SCA had not subjected Seth Alter to retaliation. Id. at ¶ 31.

200.    Two months later, Seth Alter was terminated. Id. at ¶ 32.

201.    Much like Seth Alter, Relator Aldana's claims were dismissed by the OIG after the New York City Department of Investigations referred her complaint to the OIG to be investigated.

202.    Despite describing to Director of Operations, Nick Scicutella, of the OIG that she was terminated for advising her superiors that she saw duplicate invoices, the OIG found that no fraud had been committed.

203.    Furthermore, the OIG interviewed Relator Aldana's colleagues, and they told the OIG that Defendant SCA was committing fraud, but the OIG determined that Defendant SCA did not commit fraud, waste, or abuse and concluded its investigation.

204.    In 2022, Anika Nicole Smith, a former Operations Manager, stole Three Million Dollars ($3,000,000.00).

205.    Defendant SCA's employees reported the stolen funds to the OIG, but the OIG refused to investigate the matter.

206.    The OIG, Felice Sontupe, the current Inspector General, William Schaeffer, are and/or were employees of Defendant SCA.

207.    The current Inspector General, William Schaeffer, whose task is to prevent fraud, waste and abuse, is also a Vice President of Defendant SCA.

208.    Therefore, the OIG's employees are not independent of Defendant SCA and therefore work at the behest of Defendant SCA.

28

Our File No.: 132265

I.    <u>Specific Examples of Fraud</u>

a.    Overpayments for Services, Double Payments for Services, and Payments for <u>Unauthorized Services</u>

209.    Contractors are and have been regularly resubmitting PARs, RFPs, and/or invoices that were previously paid or rejected by Defendant SCA employees.

210.    Nonetheless, Defendant SCA either: (1) repaid contractors for services rendered or (2) paid contractors for services that were not rendered or for services that Defendant SCA previously rejected at the PAR stage.

211.    Examples of fraud can be found on Defendant SCA's Authorization to Proceed (herein, "ATP") Jobs Report.

212.    An ATP request is a document submitted by architectural and/or engineering firms that describe the proposed work that is to be performed and its cost.

213.    After reviewing a PAR, Defendant SCA's Operations Managers will: (1) approve the PAR in its entirety; (2) deny the PAR in its entirety, or (3) amend the PAR to reduce or increase the award amount.

214.    One specific example of fraud occurred on July 11, 2022, when Defendant SCA paid Velocity Architecture & Engineering Group, D.P.C. $16,499.63 for a job that Defendant SCA previously rejected on April 27, 2020, in the amount of $16,499.63.

215.    On numerous occasions, contractors resubmitted claims for payment like the example provided above.

216.    A former employee of Defendant SCA had told Velocity Architecture & Engineering Group, D.P.C. to stop resubmitting PARs, RFPs, and/or invoices that were: (1) already paid; (2) lacked supporting documentation; or (3) egregiously overbilled.

Our File No.: 132265

217. Nonetheless, Velocity Architecture & Engineering Group, D.P.C. and other contractors would resubmit PARs, RFPs, and/or invoices, which would often be paid a few months later.

b. Improper Utilization of Awarded Contracts

218. Defendant SCA assigns projects to each contractor pursuant to contracts that Defendant SCA has with each Contractors.

219. Defendant SCA has and continues to assign projects to contractors who offer money, jobs, and political favors in return, while contractors who cannot offer those benefits are offered fewer projects, if any, and less valuable projects.

220. For example, Defendant STV has 20 active contracts with Defendant SCA.

221. One of Defendant STV's contracts had an initial contract value of Four Million Dollars ($4,000,000.00).

222. However, Defendant STV quintupled the value of the award to Twenty Million Four Hundred Thirty-One Thousand Dollars ($20,431,300.00).

223. Instead of awarding projects fairly, Defendant SCA awards projects to contractors who return favors.

c. Contractors' Refusal to Properly Closeout Projects

224. After a contractor substantially completes a project it is supposed to address "punchlist items" - - i.e., jobs related to finishings - - with the hired contractor and the assigned Project Officer and Design Project Manager from Defendant SCA in order to closeout the Project in order to "achieve" a letter of completion.

225. Once Defendant obtains a letter of completion, Defendant SCA will prepare a notice of transfer package and submit it to Division of School Facilities and Defendant SCA is no

Our File No.: 132265

longer responsible for a project, which means contractors can no longer receive payment for services.

226.    Therefore, contractors are incentivized to prolong projects in order to continue duplicate billing for services long after the project has been completed and with minimal oversight.

227.    Furthermore, Defendant SCA and contractors' failure to closeout projects results in higher costs because Defendant SCA is responsible for any damage to the building or injuries that occur instead of the New York City Department of Education's Division of School Facilities.

d.    Improper Billing Practices

228.    In June of 2016, a former architect of Susan Doban Architect, PC, advised an employee of Defendant SCA that his supervisors told him that any claims not approved or paid by clients were to be billed to Defendant SCA.

229.    On April 10, 2024, Defendant SCA's Chief Contracting Officer, Stacey Tyson, created an ATP Request for outdated timesheets and she stated in the "Comments" section: "NO TIMESHEETS REQUIRED - - 70% PRO RATED ATP."

230.    In other words, Defendant SCA paid contractors at the rate of 70% without reviewing or verifying any documentation.

e.    Management's Undue Influence

231.    Tyson has pressured and continues to pressure employees to approve PARs, RFPs, and/or invoices that lacked supporting documentation or that were duplicates.

232.    Tyson has prepared and continues to prepare hundreds of ATPs with an approximate value of $100,000,000.00, knowing that as Chief Contracting Officer, her subordinates will authorize the ATPs that she prepared, even duplicates, because her subordinates fear retaliation.

31

Our File No.: 132265

f.   Overbilling

233.   Contractors have repeatedly overbilled for additional services.

234.   For example, on one project, PS32Q, Velocity Architecture & Engineering Group, D.P.C. created two PARs for additional services with a total value of $29,662.49.

235.   The first PAR was dated October 11, 2023, and the second PAR was dated January 8, 2024.

236.   Both PARs were for site visits from October 3, 2023, through December 23, 2023.

237.   The first PAR only included time for architects and excluded the engineers' time.

238.   However, proposals for site visits should include both architects and engineers.

239.   Velocity Architecture & Engineering Group, D.P.C.'s refusal to perform site visits with all professionals present results in the Project Manager billing twice the time to Defendant SCA.

240.   Furthermore, Velocity Architecture & Engineering Group, D.P.C. billed Defendant SCA for a senior architect's time and an architect's time, however, Velocity Architecture & Engineering Group, D.P.C. should have only billed Defendant SCA for a senior architect's time as a second architect's time is unnecessary and wasteful.

g.   Improper use of Federal and State Funds by Defendant SCA

241.   Defendant SCA awarded consultant contracts to current employees of Defendant SCA.

242.   For example, on March 1, 2024, Defendant SCA awarded Marianne Egri, VP of Finance and Human Resources of Defendant SCA, a consultant contract in the amount of $200,000.00 for the term of March 1, 2024, through February 28, 2025.

32

Our File No.: 132265

h.  KPMG LLP's 2022 Audit Report

243.    In January 2022, KPMG LLP prepared an audit report regarding Defendant SCA's payment authorization process (herein, "Audit Report").

244.    The Audit Report concluded that Defendant SCA does not: (1) "have specific guidelines that document the roles, responsibilities, and processes for payment authorization" and Defendant SCA "offers minimal payment authorization documentation on [its] website and a lack of instruction for how to conduct a review of a vendor invoice at the department level"; (2) "have consistent training and defined roles for how to conduct the content review of invoices" and "some departments do not consistently review the supporting documentation at the level needed for the control to be effective"; (3) "have a formalized training program that can provide tracking and accessibility of related trainings regarding content reviewed of invoices for all personnel involved with the payment authorization process"; (4) "provide their vendors with reminders of being compliant with invoicing requirements and expectations, which leads to vendors submitting invoices inconsistently" and "without appropriate supporting documentation"; (5) "conduct reviews of core data stored" within its data tracking programs "to identify, potential red flags, or opportunities for improvement regarding payment authorization processes"; (6) "have a formalized process utilizing [key performance indicators] to consistently assess the timeliness of vendor requests for payment"; and (7) "retain internal supporting documentation from a specific sample review to demonstrate how vendor invoices [] are review prior to authorizing payment."

245.    In September 2022, KPMG LLP prepared a second audit report regarding project closeouts (herein, "Second Audit Report"), particularly as it related to construction aspects of a project.

Our File No.: 132265

246.    "The primary objective of this internal audit was to assess the [Defendant] SCA's protocols in place that govern the closeout process and whether projects are closed out effectively and efficiently."

247.    The Audit Report determined that Defendant SCA: (1) Project Officers were not and are not using the Active Closeout Tracking system in order to properly track closeout requirements and action items"; (2) "does not leverage closeout data that is collected across various systems to enhance or support key business decisions"; (3) lacked "consistent communication and monitoring of closeout activities" and there "are frequent lags in communication amongst the many departments and divisions involved in the closeout process, and there is no definitive group or individual to oversee the entire process on each project, ultimately leading to projects that remain in the final stages of closeout for an extended period"; (4) submitted "inconsistent or misleading information" in one department, which was discovered by comparing information from other sources; and (5) "frequently experience[d] inefficiencies with closing requirements that involve external agencies during the closeout process."

248.    One of the schools, P.S. 108K has been in the closeout phase of a project for 2,520 days.

249.    This is significant because a closeout should be done within a year.

250.    Contractors refuse to close out projects because as long as a project remains open contractors continue billing for services that: (1) were never performed or (2) should be performed by employees of the New York City Department of Education's Division of School Facilities.

251.    Furthermore, once contractors are paid over 95% of the contract amount, "there are few monetary incentives for contractors to provide the final closeout documents."

Our File No.: 132265

252. Nonetheless, contractors continue to bill and receive payment while projects remain open.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANT SCA
### *Violations of the Federal False Claims Act*

253. Plaintiffs/Relators hereby repeat and reallege each and every allegation set forth above with the same force and effect as set forth herein.

254. The United States of America seeks relief against Defendant SCA under 31 U.S.C. §§ 3729(a)(1)(A) - - (a)(1)(B).

255. Defendant SCA caused to be presented and/or conspired to be presented false or fraudulent claims for payment or approval.

256. The United States of America significantly overpaid contractors because of Defendant SCA's fraudulent conduct.

257. Defendant SCA's false claims have caused the United States of America to suffer substantial financial damage.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT SCA
### *Retaliation in Violation of the Federal False Claims Act*

258. Plaintiffs/Relators hereby repeat and reallege each and every allegation set forth above with the same force and effect as set forth herein.

259. 31 U.S.C. § 3730(h) prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the Federal False Claims Act.

260. As described above, after Relators engaged in activity protected under the Federal False Claims Act, Defendant SCA retaliated by terminating Relators' employment.

Our File No.: 132265

261.   As a direct and proximate result of Defendant SCA's unlawful retaliatory conduct in violation of the Federal False Claims Act, Relators have suffered, and continue to suffer, economic loss, for which Relators are entitled to reinstatement with the same seniority status that Relators would have had but for the discrimination, double the amount of back pay, interest on the back pay, and compensation for any special damages sustained, including litigation costs and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANT SCA
*Retaliation in Violation of NYS False Claims Act*

262.   Plaintiffs/Relators hereby repeat and reallege each and every allegation set forth above with the same force and effect as set forth herein.

263.   Section 191 of the NYS Finance Law prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the NYS False Claims Act.

264.   As described above, after Relators engaged in activity protected under the NYS False Claims Act, Defendant SCA retaliated by terminating Relators' employment.

265.   As a direct and proximate result of Defendant SCA's unlawful retaliatory conduct in violation of the NYS False Claims Act, Relators have suffered, and continue to suffer, economic loss, for which she is entitled to reinstatement with the same seniority status that Relators would have had but for the discrimination, double the amount of back pay, interest on the back pay, and compensation for any special damages sustained, including litigation costs and reasonable attorneys' fees.

36

Our File No.: 132265

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT SCA
### *Violations of the NYS False Claims Act*

266. Plaintiffs/Relators hereby repeat and reallege each and every allegation set forth above with the same force and effect as set forth herein.

267. New York State seeks relief against Defendant SCA under the NYS False Claims Act.

268. Defendant SCA caused to be presented false and/or fraudulent claims for payment or approval.

269. New York State significantly overpaid Defendant SCA because of Defendant SCA's fraudulent conduct.

270. Defendant SCA's false claims have caused New York State to suffer substantial financial damage.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT SCA
### *Retaliation in Violation of the NYC False Claims Act*

271. Plaintiffs/Relators hereby repeat and reallege each and every allegation set forth above with the same force and effect as set forth herein.

272. Section 7-805 of the NYC False Claims Act prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the NYC False Claims Act.

273. As described above, after Relators have engaged in activity protected under the NYC False Claims Act, Defendant SCA retaliated by terminating Relators' employment.

274. As a direct and proximate result of Defendant SCA's unlawful retaliatory conduct in violation of the NYC False Claims Act, Relators have suffered, and continue to suffer, economic

37

loss, for which Relators are entitled to reinstatement with the same seniority status that Relators would have had but for the discrimination, double the amount of back pay, interest on the back pay, and compensation for any special damages sustained, including litigation costs and reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF AGAINST DEFENDANT SCA
### *Accounting*

275.    Plaintiffs/Relators hereby repeat and reallege each and every allegation set forth above with the same force and effect as set forth herein.

276.    Plaintiffs/Relators - - having used information prepared by Defendant SCA in the ordinary course of business - - have established significant discrepancies between Defendant SCA's planned budget and payments to contractors.

277.    Therefore, Plaintiffs/Relators demand an accounting from Defendant SCA.

## DEMAND FOR A JURY TRIAL

278.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs/Relators demand a trial by jury.

WHEREFORE, Plaintiffs/Relators demand judgment against Defendant SCA as follows:

a.  On the First Claim for Relief, treble damages for the United States of America, in an amount to be determined at trial, and a monetary penalty for each false or fraudulent claim, record, or statement made, presented or caused to be presented by Defendant SCA;

b.  On the Second Claim for Relief: (i) an award to Relators for reinstatement with the same seniority status that Relators would have had but for the unlawful retaliation; and (ii) an award to Relators for double the amount of backpay owed, as well as interest on the backpay;

Our File No.: 132265

c. On the Third Claim for Relief: (i) an award to Relators for reinstatement with the same seniority status that Relators would have had but for the unlawful retaliation; and (ii) an award to Relators for double the amount of backpay owed, as well as interest on the backpay;

d. On the Fourth Claim for Relief, treble damages for New York State, in amount to be determined at trial, and a monetary penalty for each false or fraudulent claim, record, or statement made, presented or caused to be presented by Defendant SCA;

e. On the Fifth Claim for Relief: (i) an award to Relators for reinstatement with the same seniority status that Relators would have had but for the unlawful retaliation; and (ii) an award to Relators for double the amount of backpay owed, as well as interest on the backpay;

f. An award to Relators for any special damages, including attorneys' fees and litigation expenses incurred in bringing this action under the Federal False Claims Act, NYS False Claims Act, and NYC False Claims Act; and

g. Any and all further relief that the Court deems just and proper.

Dated: December 12, 2025
Bronx, New York

Respectfully submitted,

By: _____
Jaazaniah Asahguii, Esq. (JA 7624)
COHEN & COHEN LAW
540 East 180th Street, Suite 203
Bronx, New York 10457
Tel.: (212) 564-1900 ext. 304
Fax: (212) 954-5566
Email: jasahguii@cohenlawfirmllc.com
*Attorneys for Relators*

39

Our File No.: 132265